Hornblower, C. J.
delivered the opinion of the court. ■
As to the propriety of the remedy, supposing the obligation to be clear, there cán be very little doubt. The fact that an indictment would lie, furnishes no objection, in a case of this kind. This was decided after full argument, in the case of Rex. v. The Severn and Wye Railway Company, 2 Barn. and Ald. 646; and in The State v. Holliday, 3 Halst. R. 205.
The reasoning of the respective courts, in those two cases, is strikingly similar, although Chief Justice Ewing does not cite the English case, and probably, had not seen a report of it. Chief Justice Abbott, in that case remarks, “If an indictment had been a remedy, equally convenient, beneficial and effectual as a mandamus, I should have been of opinion that we ought not to grant a mandamus; but I think it is perfectly clear, that an indictment is not such a remedy; for a corporation cannot be compelled, by indictment, to re-instate the road.” The company in that case had taken up a branch of their road, which led to certain coal mines, and had opened another road to mines of their own ; and the mandamus was applied for to compel them to relay their road, where they had taken it up. “The court may indeed,” continues the Chief Justice, “ in case of conviction, impose a fine; and that fine may be levied by distress; but the corporation may submit to the payment of the fine, and refuse to reinstate the road.” In the State v. Holliday, Chief Justice Ewing enters into a very elaborate argument on the subject, and shows by authority, as well as on principle, that unless there be a legal and specific remedy, a mandamus will issue in cases of this sort, although an indictment would also lie. That was the case of refusal, by the overseer of the highway, to open, clear out and make a certain road, within the limits assigned to his care, by the township committee. “It is manifest,” says the Chief Justice, after enumerating the remedies, by presentment, fine and penalty, given by the statute against delinquents in such cases— “ it is manifest, that the penalty may be paid, or the fine satisfied ; and yet, the road may not be opened or cleared out, nor the public be enabled to enjoy the use of it. These remedies then cannot be denominated, specific.” Hence the Chief Justice concludes, that a mandamus would lie.
*661 A» long ago as the year 1693, it was alleged in argument on behalf of the crown, that “ it was never yet doubted, but that this court might remove by mandamus, all common nuisances, or anything done to the prejudice of the public.” And on the part of the defendant in that case, it was admitted, that the court of King’s Bench had granted a mandamus to abate a nuisance, without trial; but then, the fact had been made certain, either by matter of record, or by a view, or presentment by a grand jury. So it was in Jacob Hall’s case, who was presented by the jury for a nuisance in the highway; though it was at Charing Cross, in the view of the Justices, coming to Westminster Hall. Rex v. St. John’s College, 4 Mod. 237, 240.
Thus it seems to have been held, that a mandamus might issue where the public interest required an immediate remedy: not merely, when an indictment would lie, but even after the finding of a presentment by the jury.
Mr. Ohitty, in his book of General Practice, vol. I, page 790, after laying down the general rule, that this writ is only to issue, where the party has no other specific remedy, admits, that “ in the case of a dear public right, if it be important to prevent great and immediate public damages or inconvenience to many persons, the court should immediately interfere ; as in case of a public bridge, or other work being in a very dangerous state, and requiring immediate repair, or support. If there be no doubt respecting the obligation to repair, a mandamus may be issued, although there be another remedy by indictment.” I have do hesitation therefore in saying, that so far as a mandamus is objected to on the ground of another remedy existing, I see no reason to withhold the writ.
In the next place. Is the company bound to erect a bridge over their canal, where it crosses the street in question ?
By the original act of incorporation, Harr Comp. 353, sec. 8, the company is authorized to erect a wing-dam in the Delaware river, between the Assanpink, and the head of Wells’Falls; and a raceway, in, along and near the bank of said river, in the neighborhood of Trenton ; provided, they are not thereby to impede the passage of fish, rafts, arks and boats. By the 9th sec. the company is authorized, particularly, to Cut a main race-way *662 from the wing-dam, to any point, below the Trenton Falls, not more than a mile and a half therefrom; and also to cut and make as many lateral or branch race-ways, &e., from the main raceway, to the river Delaware, as the company may deem expedient, for the purpose of creating and using the water powers, for mills and manufacturing purposes. By the 16th sec. the company is authorised, from time to time, to construct, make, erect and form all such embankments, reservoirs, aqueducts, culverts, locks, weirs, gates, ways, bridges, and other works, as the managers may deem convenient and necessary for the uses and purposes aforesaid; and to repair and improve the same. They are further impowered, to survey and lay out the most eligible route for their raceway; and to enter upon, and appropriate all necessary lands for the purposes of their association. And the act prescribes a mode for a just and equitable appraisement and satisfaction of the damages, that each owner of lands may sustain, by such appropriations of the same to the use of the company.
Now can it be possible, that in the exercise of these powers, the company may cut through the public thoroughfares; nay, the most public streets of the city of Trenton, and be justified in leaving them impassable; thereby throwing upon the city, or county, the burden of following after them, and erecting and keeping up bridges, rendered necessary by the company’s own operations, undertaken for its own private emoluments ? Such a proposition would seem to be unreasonable on, its very face.
It is objected that the privilege of cutting through highways, is clearly given by the charter; and, as no obligation is expressly imposed of building the bridges, that might thus become necessary, it is to be presumed that the legislature intended to grant the privilege, without imposing the burden ; leaving that to lie, where the common or statute law places it, viz: on the township or the county. This it is assumed, the legislature had an undoubted right to do ; and the presumption, raised by their silence is that they intended to do it.
I cannot concur in this reasoning. Without inquiring at this time, whether the legislature had a constitutional right to grant a charter with express provisions of that sort, it seems clear to *663 my mind, that in the absence of such express provisions, a grant of such immunities cannot be implied in this case.
I understand that no question is made about Delaware street being a public street and highway, recognized and used as such. I also understand it to be admitted by the company, that they have, from the first, erected and kept up one or more bridges, rendered necessary by their raceway, in other streets in Trenton. Hence, on the principle that contemporánea expositio est optima et fortissimo in lege, it would seem to be inferable, that the company accepted their charter, on the implied condition of erecting and keeping up bridges, wherever the canal or raceway which they sought the privilege of constructing, should happen to cross the public thoroughfares. The fact of their putting up and maintaining bridges, at their own expense, is evidence of what their understanding was at the time. And this is the most reasonable and common sense construction of their charter.
This is a private corporation ; chartered for private emolument ; with an incidental reference, it is true, to the public weal; as is the case, in contemplation of law, in the erection of all corporations. They would not be made bodies politic and corporate, if no incidental public advantages were to be expected from their existence. But still, corporations like this, of the Trenton Water Power Company, are private corporations; and intended to reach only incidental public good, by holding out the encouragement of direct private advantage. Hence, when a private corporation like this, seeks the enjoyment of powers and franchises, which may in any degree infringe or injuriously affect, any of the rights of individuals, or of communities, they mast expect to make adequate compensation. This they are compelled to do, in the case of private individuals ; as when they take their lands, or interfere with their rights or easements. Compensation, in such cases, has to be made at once; and if they cannot agree with the parties, the charter generally points out a just and equal mode of assessing the damages. But with regard to encroachments on public rights, no consideration is usually paid at the beginning of the enterprise; and if the legislature permits them to make such encroachments, as do not admit of any specific redress or remedy, it seems to be a necessary inference, that the *664 legislature intended an absolute grant, of such franchises, in consideration of the incidental public benefits of the corporation. But the presumption of law is always against such constructive, grants of unconditional adverse privilege, without any palpable consideration; and they are never allowed to exist, where any mode is apparent, in which the public damage may be prevented or redressed, without annulling or violating the specific powers or privileges granted by the charter.
In accordance with these views, it has been repeatedly held in England, that where a private corporation, in the prosecution of its own objects, has rendered a bridge necessary in a public highway, where none was necessary before, it was their duty, and not the duty of the county to erect and maintain such bridge. This was an infringement of public rights, which the company could in great measure repair, by erecting and keeping up the bridge. It was in the pursuit of their own advantage, that they rendered the bridge necessary, and therefore they ought not to burden the public with its maintenance; qui sentit eommodvm, sentiré debet et onus. Thus a canal company, authorized by an act of parliament, to make the river Bain navigable, and to make and enlarge certain navigable cuts, and build bridges and other works, connected with their navigation, having, for their own benefit, made a navigable cut, and deepened a ford which crossed the highway, and thereby rendered a bridge necessary for the passage of the public, and which was accordingly built at the expense of the company, in the first instance; the court of King’s Bench held the company bound to maintain the bridge; and that the burden of repairs was not to be thrown upon the inhabitants of the county, Rex v. The Inhabitants of Lindsey, 14 East. 317. In Rex v. Kerrison, 3 Maule and Selw., 526, the case was, that certain persons and their successors were authorized, by act of parliament, to make a river navigable, and to cut the soil of any persons, for making a new channel; and by virtue of which they cut through a highway and rendered it impassable, and a bridge was built over the cut, over which the public passed, and which had been repaired by the proprietors of the navigation, the court held that the proprietors, and not the county were bound to repair. No express obligation was im *665 posed, by the act of parliament, on the proprietors of the cut, in the t;ase last cited ; and it was argued on their part, that as there was no mention of bridges, nor any words of condition in the •act, no obligation arose to build bridges ; though it was admitted that the necessity of the bridge originated with the making of the cut. The defendant also relied strongly on the circumstance, that it was not proved that the proprietors of the cut, (whom he represented,) originally built the bridge, but only that they had occasionally repaired it. Lord Ellenborough met this argument thus : “ The act enables them to cut new channels, as occasion should require; and if occasion requires them to cut through a public highway, their duty is to furnish a substitute to the public, by means of a bridge. Can we put any other construction upon the act but this, that the legislature intended that so far as regarded the making of the river navigable, and the cutting new channels for that purpose, neither public nor private rights should stand in their way ; but still they should make good to the public in another shape, the means of passage over such ways as they were empowered to cut through.” Mr. Justice Bayley added, “There would have been no difficulty in framing an indictment, against the proprietors, for not building a bridge. The indictment might have charged them with cutting across the highway, and if they had pleaded the act of parliament, the court would have determined upon it, that they had power 'only to make the cut, snb modo, that is, providing a substitute to the public.”
I fully concur in the reasoning of the court in that case, and am therefore of opinion, that the Trenton Water Power Company is under an obligation to build, and keep in repair, bridges over their canal or raceway, wherever it crosses any public highway or street.
The only remaining question is, whether the obligation of the company is so dear, that the court ought to grant a mandamus. For it is undoubtedly improper to grant this writ, except in cases of clear obligation. The writ itself, in its very form, prejudges the party, on the matter of his obligation. True, he may return to the first writ any matter of avoidance; as that he does not sustain the office, or the relation, which the writ supposes ; as was done in the case of The State v. Holliday, when brought *666 before the court again in 3 Halst. R. 265; where Holliday returned, that he was not overseer of the highway. But if the defendant admits, or cannot deny his office, or the capacity or relation in which the writ supposes him to stand, and the facts recited in the writ, he cannot question or deny his duty and obligation, in point of law. Therefore the court ought to be quite clear on that point, before issuing a writ involving such high prerogative powers.
From a case which is noted in 1 Chitty’s General Practice, 412, 791, and 813, but which does not seem to have been reported, viz, the case of Rex v. Rymouth, decided in the King’s Bench in 1832, it seems to be held to be the proper course in cases of doubt or difficulty, to leave the parties first to establish the right, upon indictment, before granting the writ of mandamus.
If the offence complained of, says Mr. Chi tty, p. 412, relying on that case, consists in the non-observance of a clear, public duty, then the court of King’s Bench will interfere by Mandamus ; but if the obligation or the offence be doubtful, that court will leave the parties complaining, first to establish the right, or duty, or obligation, and the offence, upon an indictment at common law; and not interfere, till that has been done.
This appears to be reasonable and right. But where the court has no doubts on the question of obligation; and the act, or omission, complained of, is admitted, I can see no good to be attained by putting the parties to the expense and delay of proceeding by indictment, before granting' that relief, which it is clearly seen, must in the end be awarded. And as the obligation of the defendants, in this case, appears to my mind to be clear, and free from all doubts, I am decidedly of opinion that we ought to grant the motion of the applicants.
Mandamus awarded.
Whitehead J., concurred; the other Justices did not hear the argument, and expressed no opinion.
Cited in State v. Freeholders of Essex, 3 Zab. 217; Mor. Can. & Bk’g Co. v. State, 4 Zab. 69; State v. Jacobus, 2 Dutch, 136.